931 F.2d 893
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ernesto Cabrera AGUILAR, Defendant-Appellant.
 No. 90-3857.
 United States Court of Appeals, Sixth Circuit.
 April 30, 1991.
 
 Before BOYCE F. MARTIN JR. and RALPH B. GUY, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Ernesto Aguilar, pleaded guilty to one count of conspiracy with intent to distribute cocaine in excess of 500 grams. 21 U.S.C. Sec. 846. The guilty plea was pursuant to a written plea agreement, which provided that the government would not pursue additional charges against Aguilar; the minimum relevant conduct to be considered for sentencing guidelines purposes was one kilogram of cocaine; Aguilar would not contest the forfeiture of $92,451.95 in United States currency that was seized; and the determination of the applicable guideline range for sentencing purposes rested with the court.
 
 
 2
 After a protracted sentencing hearing, the district judge determined Aguilar's guideline offense level to be 32 and assigned a criminal history category of one. Consistent with this finding, Aguilar received a sentence within the applicable guideline range of 144 months.
 
 
 3
 Aguilar filed a timely appeal and argues that the court erred in increasing the base offense level for possession of a firearm and in computing the amount of cocaine to be included in the relevant conduct analysis. Finding no merit to these contentions, we affirm.
 
 I.
 
 4
 Aguilar and some of his associates were the subject of a narcotics investigation in Columbus, Ohio. This investigation led to the issuance of search warrants, authorizing searches of an apartment shared by Aguilar and Gustavo Leaniz and a storage unit rented by Aguilar. Aguilar and his girlfriend were at home when the search warrant covering those premises was executed on January 16, 1990. The agents found cocaine, cash, assorted drug paraphernalia, and a loaded firearm in a nightstand next to Aguilar's bed. Aguilar was arrested.
 
 
 5
 The search of the storage unit produced a Honda motorcycle, substantial quantities of cocaine, and $23,950 in cash.
 
 
 6
 On January 17, 1990, narcotics agents executed a search warrant at a storage unit located very near Aguilar's, but leased to Aguilar's roommate, Leaniz. The agents found 3.9 kilograms of cocaine, a Kawasaki motorcycle, and assorted drug paraphernalia. Part of the cocaine was found in a bag of a type that would be used to store the motorcycle cover, which was covering Aguilar's Honda in the adjacent storage unit.
 
 
 7
 Agents also secured warrants for and searched three safe deposit boxes. One, in the name of Aguilar, contained $60,000 in cash. The other two, rented by Leaniz, contained nothing of value.
 
 
 8
 Aguilar and Leaniz were indicted by the grand jury on February 15, 1990, and each was charged with conspiracy to distribute and possess with intent to distribute over five kilograms of cocaine. In a second count, each defendant also was charged with possession of over five kilograms of cocaine with intent to distribute.[1]
 
 
 9
 On March 2, 1990, Aguilar entered a plea of not guilty to the indictment. On May 7, 1990, Aguilar pleaded guilty to a one-count superseding information. Leaniz was never arrested and remains a fugitive.
 
 II.
 
 10
 One of the specific offense characteristics to be considered under the sentencing guideline applicable to the offense of conspiracy to possess with intent to distribute cocaine is the possession of a firearm during the commission of the offense. United States Sentencing Commission, Guidelines Manual, Sec. 2D1.1(b)(1). The commentary to Sec. 2D1.1 states in relevant part:
 
 
 11
 The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.
 
 
 12
 U.S.S.G. Sec. 2D1.1, comment. (n. 3).
 
 
 13
 Aguilar does not argue that the weapon found would not constitute a firearm used during the commission of a drug offense.[2] Rather, he argues that there is no proof the weapon belonged to him. This argument is predicated on the fact that his girlfriend was present at the house when it was searched, and he shared the house with Leaniz.
 
 
 14
 This argument is unpersuasive. This was not a trial where proof must be beyond a reasonable doubt, but a sentencing hearing where all that is required is proof by a preponderance of the evidence. Further, the defendant was free to testify at the sentencing hearing and deny possession or call witnesses. He did neither. The facts that provide sufficient circumstantial evidence to support the trial court's findings are: the handgun was in Aguilar's bedroom in a nightstand next to the bed, the house was used as a narcotics packaging and distribution center, the amounts of narcotics and cash involved indicate a need for protection, and there was nothing to indicate the weapon belonged to the girlfriend. Even if the weapon were actually owned by the housemate, Leaniz, the evidence would support constructive possession on the part of Aguilar.
 
 III.
 
 15
 Aguilar's "relevant conduct" argument is based on his contention that he should not be charged with the 3.9 kilograms of cocaine found in Leaniz's storage unit. The cocaine that Aguilar admits to possessing would have resulted in an offense level of 26 (63-78 months). The additional 3.9 kilograms raised the offense level to 32 (121-151 months).[3]
 
 
 16
 Aguilar concedes that if he and Leaniz were co-conspirators, then he would be accountable for the cocaine possessed by Leaniz as part of the conspiracy. He argues, however, that the evidence does not support that he and Leaniz were co-conspirators. The resolution of this issue is complicated to some degree by the fact that although Aguilar and Leaniz were named as co-defendants in the original indictment, the superseding information, although charging conspiracy, did not mention Leaniz by name. Further complicating matters, is the fact that the superseding information alleges the dates of the conspiracy to be "beginning [on] or about October 27, 1987, and continuing up to and including January 16, 1990, the exact dates being unknown...."
 
 
 17
 We address the matter of the dates mentioned in the indictment first. Defendant argues that since the cocaine was not found in Leaniz's storage unit until January 17, 1990, it could not be included as the fruits of a conspiracy alleged to have ended on January 16, 1990.
 
 
 18
 The indictment covered the period "beginning [on] or about October 27, 1987, and continuing up to and including January 16, 1990, the exact dates being unknown...." (Emphasis added). The purpose of using the "on or about" language is because it is often difficult, if not impossible, to pin down the starting or ending dates of a criminal endeavor. This is particularly true where the crime charged is conspiracy. This court, sitting en banc, had occasion in a related context to consider how close the government would be held in its proofs relative to the "on or about" dates alleged in an indictment. We stated in United States v. Neuroth, 809 F.2d 339, 342 (6th Cir.1987):
 
 
 19
 The type of crime should also be considered. For instance, with some crimes, such as conspiracy, the proof is often nebulous as to exactly when the crime occurred. "On or about" language would be preferable in such a case, as compared to cases involving more "concrete" crimes, like murder, which are more easily pinpointed in time.
 
 
 20
 Thus, the mere fact that the indictment suggests an approximate ending date for the conspiracy would not be controlling.
 
 
 21
 Turning now to the conspiracy itself, it has long been the law that "conspirators are generally held liable for the known or foreseeable acts of their co-conspirators...." United States v. Walton, 908 F.2d 1289, 1299 (6th Cir.1990). The Sentencing Guidelines reflect this rule of law in their treatment of "relevant conduct." Section 1B1.3(a)(1) of the Guidelines provides in pertinent part that relevant conduct includes "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable...." (Emphasis added). The commentary to this section states:
 
 
 22
 Conduct "for which the defendant would be otherwise accountable," as used in subsection (a)(1), includes conduct that the defendant counseled, commanded, induced, procured, or willfully caused. (Cf. 18 U.S.C. Sec. 2.) In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.
 
 
 23
 U.S.S.G. Sec. 1B1.3, comment. (n. 1).
 
 
 24
 The issue thus boils down to whether it fairly can be said that Aguilar and Leaniz were part of a "jointly undertaken criminal activity," and, if they were, was it reasonably foreseeable to Aguilar that Leaniz would be in possession of this quantity of cocaine. The district judge, at the sentencing hearing, considered this issue at length and we believe correctly summarized the state of the evidence on this point:
 
 
 25
 Now, some of the principles enunciated in U.S. v. Sailes [United States v. Sailes, 872 F.2d 735 (6th Cir.1989) ] apply with equal force to the instant case. Mr. Aguilar, after all, was the lessee of the premises where he and Mr. Leaniz conducted their drug distribution packaging activities. Even if we were to accept defense counsels' characterization of the facts of this case, which the Court is not prepared to accept, but assuming arguendo that the Court did and assuming that the Court concluded that these were separate conspiracies and that Mr. Leaniz had his own drug distribution business and that Mr. Aguilar had his own separate drug distribution business ... the evidence here shows that Mr. Aguilar knowingly permitted Mr. Leaniz to carry on those activities in Mr. Aguilar's home, and that in itself would be sufficient to render him responsible for the drugs found in Mr. Leaniz's storage facility. He knew that his co-conspirator was involved in these activities, he knew that he had a storage locker, and he know he was using it for the storage of cocaine.
 
 
 26
 But beyond that, the evidence in this case convinces this Court that indeed these two gentlemen were involved in the same drug conspiracy, either they were partners or perhaps there was some hierarchy between them, but that clearly they were both involved in the same drug distribution activities and that Mr. Aguilar was assisting Mr. Leaniz in this common goal to distribute drugs.... They lived ... together, and clearly they were more than simply roommates ... together because the evidence indicates that, without a doubt, Mr. Aguilar had unlimited access to Mr. Leaniz's part of the apartment because Mr. Aguilar's briefcase with his billfold and money ... were found in Mr. Leaniz's bedroom. That is where the drug wrapping machine was. That is where the scales were found, and clearly Mr. Aguilar not only had access to but used that bedroom. He had stored his billfold and money in that bedroom in his briefcase, and since we know that Mr. Aguilar was involved in distributing drugs and the only drug wrapping machine and the only drug scales found in the house were in Mr. Leaniz's bedroom where the billfold of Mr. Aguilar was found, it is the Court's conclusion that he used that bedroom.... They not only shared the apartment, they shared all of the drug paraphernalia that was needed to conduct their business.
 
 
 27
 .............................................................
 
 
 28
 ...................
 
 
 29
 * * *
 
 
 30
 Now, these men not only shared an apartment together, their financial affairs were intertwined, and it is interesting to this Court that all of the cash was found in Mr. Aguilar's safety deposit box and storage locker ... [a] very, very substantial amount of cash, and Mr. Leaniz was gone. It appears to the Court that most likely Mr. Aguilar not only minded the store, but also kept control of the cash during Mr. Leaniz's absence. Both of these gentlemen had storage lockers in the same location. Both of those storage lockers were used for the purpose of storing cocaine and drug paraphernalia and cash, and the Court concludes that both were aware of what they were using those storage lockers for, and that indeed there was some interchange between them with respect to these storage lockers. We have the fact that Mr. Aguilar was named as an additional authorized access person on Mr. Leaniz's storage locker. We have the fact that the cocaine in Mr. Leaniz's storage locker was found inside the bag for Mr. Aguilar's motorcycle cover....
 
 
 31
 .............................................................
 
 
 32
 ...................
 
 
 33
 * * *
 
 
 34
 Now, defense counsel also argued that the Court could find two separate conspiracies here because there were allegedly two different kinds of cocaine, that Mr. Aguilar's cocaine was adulterated with nicotinamide, whereas Mr. Leaniz's cocaine was not, it was one hundred percent pure cocaine.... The Court does not accept that argument, and the Court notes that indeed Mr. Aguilar had access to one hundred percent pure cocaine because the evidence indicated that he had supplied one hundred percent pure cocaine to his girlfriend....
 
 
 35
 The same is true of the cocaine residue found in the wrappings found in the trash with the note to Mr. Aguilar from one of his drug customers. That cocaine was one hundred percent pure. Interestingly enough, the cocaine found in Mr. Leaniz's bedroom was adulterated with nicotinamide, the same as that found in Mr. Aguilar's pocket, so you have got both kinds of cocaine apparently interchanged between these two men....
 
 
 36
 .............................................................
 
 
 37
 ...................
 
 
 38
 * * *
 
 
 39
 The Court believes that the evidence in this case is overwhelming to the effect that Mr. Aguilar did willfully associate himself with Mr. Leaniz's drug distribution activities and aided and abetted him....
 
 
 40
 (App. 101-110).
 
 
 41
 As we stated in Walton, in the context of a conspiracy case: "A district court's decision on the amount of cocaine a defendant is to be held accountable for is a finding of fact which must be accepted by a court of appeals unless clearly erroneous." 908 F.2d at 1300-01. Applying the clearly erroneous standard here, we conclude the trial judge's decision is adequately supported by the record.[4]
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 The indictment also contained a forfeiture count relating to the $92,451.95 that was seized from the residence, storage lockers, and safe deposit box
 
 
 [2]
 This is a switch in emphasis from the trial court where the primary focus was on whether the weapon would qualify as one used during the commission of a drug offense
 
 
 [3]
 The two-point enhancement for the firearm raised the offense level to 34, however, a two-point reduction for acceptance of responsibility brought it down to 32
 
 
 [4]
 Because of our conclusion on the propriety of including the 3.9 kilograms in the relevant conduct analysis, it is unnecessary for us to consider defendant's arguments concerning the additional 1,502.55 grams of cocaine allegedly purchased from Aguilar by Ronnie Russell