4 F.3d 995
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Guy VENTIMIGLIA and Brett Benaske, Defendants-Appellants.
 Nos. 92-2259, 92-2272.
 United States Court of Appeals, Sixth Circuit.
 Aug. 30, 1993.
 
 Before KEITH and KENNEDY, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Guy J. Ventimiglia and Brett J. Benaske appeal their sentences after pleading guilty to conspiracy to possess with intent to distribute methamphetamine. We affirm the appellants' sentences for the following reasons.
 
 I.
 
 2
 On October 29, 1990, United States Postal Inspectors opened a United States Express Mail package mailed by defendant-appellant Guy J. Ventimiglia ("Ventimiglia") in California to defendant-appellant Brett J. Benaske ("Benaske") in Michigan. The package contained a granular substance determined to be methamphetamine, a schedule II controlled substance. The Postal Inspectors rewrapped the package and executed a controlled delivery to Benaske's residence on October 30, 1990.
 
 
 3
 A subsequent search of Benaske's residence pursuant to a search warrant yielded the unopened Express Mail envelope, a triple-beam scale, a quantity of marijuana, Express Mail labels, money order and bank check receipts, and three weapons. Specifically, a shotgun and a .22 caliber rifle were found in Benaske's bedroom closet, and a second shot gun was found in the corner of the bedroom. The firearms were not loaded, and law enforcement officers failed to locate any ammunition in Benaske's residence. The receipts revealed that Ventimiglia had mailed at least eleven packages to Benaske during 1990.
 
 
 4
 On January 8, 1992, the grand jury returned a four-count indictment against Ventimiglia and Benaske: Count One charged both defendants with conspiracy "to possess with intent to distribute and to distribute various quantities of a substance containing a detectable amount of methamphetamine" in violation of 21 U.S.C. Secs. 841(a)(1) and 846; Count Two charged both defendants with knowingly using a communication facility to further their possession with intent to distribute methamphetamine in violation of 21 U.S.C. Sec. 843(b); Count Three charged Ventimiglia with distributing methamphetamine to Benaske on or about October 30, 1990, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2; and, Count Four charged Benaske with possession with intent to distribute methamphetamine on October 30, 1990, in violation of 21 U.S.C. Sec. 841(a)(1). Both Ventimiglia and Benaske subsequently pled guilty to Count One of the Indictment pursuant to Rule 11 Plea Agreements.
 
 
 5
 After reviewing Benaske's presentence report, the government objected to the Probation Department's failure to apply a two-level enhancement to Benaske's offense level pursuant to United States Sentencing Guideline section 2D1.1(b)(1) which provides: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." In support thereof, the government cited the commentary to section 2D1.1 which provides (in relevant part): "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. Sec. 2D1.1, comment. (n. 3).
 
 In response, the Probation Officer noted:
 
 6
 Section 2D1.1, Application Note 3, specifically excludes "an unloaded hunting rifle in the closet." This is the circumstance involved with two of the weapons.
 
 
 7
 An uncased, unloaded shotgun was found in the corner of the bedroom. Also found in the bedroom was approximately 1/8 to 1/4 ounce of marijuana. No methamphetamine was found in the bedroom. No ammunition was found in the home.
 
 
 8
 Whether it is "clearly improbable that the weapon was connected with the offense" is an issue for the Court to determine.
 
 
 9
 Addendum to Benaske's Presentence Report at 2.
 
 
 10
 Meanwhile, Ventimiglia objected to the Probation Officer's drug quantity determination as summarized in Ventimiglia's presentence report:
 
 
 11
 The following is a table of drug weights and the weight of envelopes and other mailing materials that were used in the shipments. The Postal Inspector computed the drug weights by estimating and deducting the average weight of mailing materials, leaving the balance weight of the drugs.
 
 
 12
 Mailing date Mailing Material Weight Drug Weight
 
 
 13
 ---------------------------------------------------------------------------
 
 
 14
 21190 Unknown .036 oz.
 
 
 15
 3490 Unknown .036 oz.
 
 
 16
 61290 7.8 oz. . 43 oz.
 
 
 17
 63090 11.0 oz. . 61 oz.
 
 
 18
 71090 14.0 oz. . 77 oz.
 
 
 19
 72790 12.0 oz. . 66 oz.
 
 
 20
 8990 8.8 oz. . 44 oz.
 
 
 21
 82290 22.0 oz. 1.22 oz.
 
 
 22
 91190 13.0 oz. . 72 oz.
 
 
 23
 10990 8.8 oz. . 48 oz.
 
 
 24
 102690 9.0 oz. . 50 oz.
 
 
 25
 TOTAL DRUGS INVOLVED 5.9 Oz.
 
 
 26
 1 Oz. = 28.35 grams; 5.9 Oz. = 167.27 grams
 
 
 27
 Ventimiglia's Presentence Report at 6.
 
 
 28
 The probation officer defended his drug quantity calculation by explaining that he first determined the "drug weight/mailing material weight" percentage of the intercepted package (i.e., .50 oz. divided by 9.0 oz. equals 5.5%), then estimated the drug weight of the previous packages by multiplying (extrapolating) the drug weight percentage times the total mailing material weight: 106.40 oz. X 5.5% = 5.85 oz. plus .036 oz. on 2-11-90, and .036 oz. on 3-4-90 (as corroborated by correspondence between the defendants), which totaled approximately 5.9 oz. (167.27 grams) of methamphetamine. The probation officer supported his drug quantity determination by examining the amount of money that Benaske mailed to Ventimiglia for the intercepted package:
 
 
 29
 MR. BENASKE paid $500.00 for the seized mailing containing 14.28 grams or approximately .50 ounces methamphetamine. Other funds sent to Guy Ventimiglia totaled $5,633.00. If $500.00 equals 14.28 grams, $5,633.00 (total amount of money as determined by various receipts which MR. BENASKE sent to Guy Ventimiglia) equals 160.88 grams.
 
 
 30
 $500 $5,633
 
 
 31
 ----- ------
 
 14.28 g = X
 X = 160.88 grams
 
 32
 Benaske's Presentence Report at 8.
 
 
 33
 The probation officer's calculations resulted in drug quantity estimates that were within 7 grams of each other, and were both well in excess of the 100-gram level which triggers the imposition of the five-year mandatory minimum sentence pursuant to 21 U.S.C. Sec. 841(b)(1)(B) which provides (in relevant part):
 
 
 34
 In the case of a violation of subsection (a) of this section involving--
 
 
 35
 ....
 
 
 36
 (viii) 10 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 100 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;
 
 
 37
 such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years.... Any sentence imposed under this subparagraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.
 
 
 38
 21 U.S.C. Sec. 841(b)(1)(B).
 
 
 39
 Following preliminary sentencing hearings on the parties' objections to the presentence reports, the district court judge determined that a drug quantity in excess of 100 grams of methamphetamine was appropriate for Ventimiglia, and determined that the firearms in Benaske's bedroom warranted a two-level enhancement to Benaske's offense level pursuant to U.S.S.G. Sec. 2D1.1(b)(1).
 
 
 40
 Accordingly, Ventimiglia's sentencing guideline range (51-63 months at offense level 24 and criminal history category I) was adjusted to reflect the statutory five-year minimum sentence that governed his sentence. On October 1, 1992, the district court judge sentenced Ventimiglia to 60 months imprisonment, to be followed by four years of supervised release. On October 6, 1992, in accordance with the government's substantial assistance motion, the district court judge departed from Benaske's sentencing range (70-87 months at offense level 26 and criminal history category II) and imposed a 60-month sentence, to be followed by four years of supervised release, and ordered that Benaske pay a $1,000 fine.
 
 
 41
 Both Ventimiglia and Benaske filed timely notices of appeal.
 
 II.
 Quantity of Methamphetamine
 
 42
 Though Ventimiglia claims that he mailed Benaske only 99.872 grams of methamphetamine, the district court judge discounted Ventimiglia's testimony and accepted the government's position:
 
 
 43
 Now, as to these checks asserted to have been for rent or other expenses owed, it does not make sense to me and I do not credit the testimony of Mr. Ventimiglia in that regard.... I am persuaded that everyone of them, consistent with the testimony of Mr. Benaske, were [sic] for drugs and not for rent or utilities or anything else of that nature.
 
 
 44
 ....
 
 
 45
 I just--I don't accept the testimony. It does not persuade me. And for that reason alone, the government's estimates which I think are rational, reliably based[,] constrained and conservative ... result in a total drug quantity in excess of a hundred grams by twenty or thirty percent.
 
 
 46
 I think another very reasonable analysis could result in a total of somewhere close to 170, 180 grams sent. I have no doubt that the statutory amount of a hundred grams was exceeded here, it's amply clear to the Court.
 
 
 47
 Transcript of Ventimiglia's Sentencing at 62-64.
 
 
 48
 Though Ventimiglia seeks to avoid 21 U.S.C. Sec. 841(b)(1)(B)'s mandatory five-year minimum sentence by challenging the district court's drug quantity calculations, the Sentencing Guidelines provide that the sentencing judge shall approximate the total quantity of drugs involved in a drug trafficking conspiracy. See U.S.S.G. Sec. 2D1.4, comment. (n. 2) ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved."). A district court's determination of the quantity of drugs that a defendant may be held accountable for is a finding of fact which must be accepted by a court of appeals unless clearly erroneous. United States v. Walton, 908 F.2d 1289, 1300-01 (6th Cir.), cert. denied, 498 U.S. 906, 989, 990 (1990).
 
 
 49
 In United States v. Walton, this court held:
 
 
 50
 We believe that the guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible. If the exact amount cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate. Thus when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.... Adopting this standard allows a District Court to perform its traditional fact-finding mission, yet still protects defendants from being held responsible for drug quantities in excess of the amounts for which they more likely than not are responsible. Allowing a court to find a defendant responsible for the maximum quantity of drugs that can plausibly be found could result in defendants receiving excessive sentences based on a finding of quantity that is more likely than not excessive. Such a result would violate a defendant's due process rights. While this may result in an underestimation of the quantity of drugs involved in some few cases, we believe it is nonetheless constitutionally required to prevent excessive sentences.
 
 
 51
 908 F.2d at 1302 (emphasis in original) (citations omitted).
 
 
 52
 The government's calculations clearly established that Ventimiglia mailed more than 100 grams of methamphetamine to Benaske thereby invoking 21 U.S.C. Sec. 841(b)(1)(B)'s mandatory five-year minimum sentence provision. Moreover, Ventimiglia's plea hearing testimony clearly reflects that Ventimiglia conspired to possess with the intent to distribute more than 100 grams of methamphetamine:
 
 
 53
 THE COURT: All right. Now, the government in this Rule 11 Agreement has agreed to recommend to the Court under a particular provision of [the] Federal Rules, that the sentence that I give you not be greater than what the low end of the guidelines would provide for, and that has the effect--you read that and you have talked with your attorney about that, true?
 
 
 54
 VENTIMIGLIA: Yes, sir.
 
 
 55
 THE COURT: That would have the effect of locking in a sixty months minimum which would also be a sixty months maximum, sentence. In other words, a specific sentence has been hit upon here by the attorneys as the appropriate sentence for you unless the government files a motion to lower it even further, do you understand that as well?
 
 
 56
 VENTIMIGLIA: Yes, sir.
 
 
 57
 Transcript of Ventimiglia's Plea Hearing at 17-18.
 
 
 58
 The district court judge rejected Ventimiglia's self-serving testimony and accepted the prosecution's drug quantity estimates after determining that the estimates were factually supported. Numerous courts have upheld similar drug quantity calculations. See, e.g., United States v. Sklar, 920 F.2d 107, 113-14 (1st Cir.1990) ("In extrapolating from Package No. 12 to the original 11 packages, the court below [acted] with due regard for the defendant's rights. Over 25 percent of the weight of the seized package was cocaine. In estimating the contraband contained in the missing packages, however, the judge found that, on average, somewhat less than 20 percent of the weight was probably cocaine. We think that this conservative approach, coupled with the fact that only 300 grams (rather than the full 350) were needed to reach the applicable offense level, safely insulates the challenged finding from clear-error attack."); United States v. Hilton, 894 F.2d 485, 486-88 (1st Cir.1990) (A Coast Guard officer "testified to having seen an estimated total of at least 22 packages similar in size and appearance to the package actually retrieved. The laboratory report performed on the retrieved package indicated that it contained marijuana, and that it had a gross weight of 14 pounds[.] After an evidentiary hearing, the court concluded that it was reasonable to believe that each package contained at least 10 pounds of marijuana.... We are convinced that the method used in the instant case to calculate the amount of marijuana was sufficiently accurate, and we can conclude that appellant would have been unable to rebut the government and establish that the total amount of marijuana weighed less than 50 kilograms.").
 
 
 59
 Because the district court judge's drug quantity determination is amply supported by the evidence, his finding that Ventimiglia mailed more than 100 grams of methamphetamine to Benaske is not clearly erroneous. We therefore reject Ventimiglia's assignment of error.
 
 Benaske's Firearms
 
 60
 On appeal, Benaske maintains that the firearm found in his bedroom, and the two firearms found in his bedroom closet, were in no way associated with the methamphetamine conspiracy:
 
 
 61
 According to Mr. Benaske's testimony, there was no shipment of the pills from California at any time during the two-week period that the guns were in his residence. Mr. Benaske testified that one of the three guns was an antique, one he had obtained from his father to clean it for him, and one he intended to fire in his five acre backyard or perhaps to take with him on a hunting trip.
 
 
 62
 ....
 
 
 63
 Mrs. Benaske testified that her son and husband had been going hunting together with guns since Brett was eight years old. This supported her husband's testimony that the guns belonged to her husband. She believed that Brett used them for hunting rabbits or deer.
 
 
 64
 ....
 
 
 65
 Possession of the weapon alone is not enough to result in enhancement. There simply are not enough other indications of a connection between the guns and the drugs in this case to take this out of the example provided in the commentary where the enhancement should not apply, which is where you have an unloaded hunting rifle in a closet.... The Judge was thus clearly erroneous and abused his discretion in finding this enhancement.
 
 
 66
 Benaske's Brief at 5-10 (citations omitted).
 
 
 67
 In response, the government claims that Benaske failed to corroborate his claim that he was an avid hunter, and maintains that Benaske's firearms supported his methamphetamine trafficking activities:
 
 
 68
 "Possession of a firearm during the commission of a drug offense creates a presumption that the possession is connected with the drug offense." Once the government proves possession, it is the defendant's burden to overcome the presumption by demonstrating that "it is clearly improbable that the weapon was connected with the offense."
 
 
 69
 Constructive possession of a firearm, and not actual use or even ready accessibility, is sufficient to warrant application of the enhancement. A sentencing judge has discretion under a preponderance of evidence standard to enhance a defendant's sentence for possessing a firearm in connection with a drug trafficking crime, and the judge's decision is reversible only upon a finding of clear error.
 
 
 70
 At least one of the shotguns in Benaske's bedroom was sitting out in the open and readily available. A small quantity of marijuana and some drug paraphernalia were also found in the bedroom. The package containing the recently-delivered methamphetamine was on the living room couch. Additional quantities of drugs and drug paraphernalia were found in the bedroom of defendant's roommate. Appellate courts, including this circuit, have upheld the imposition of a two-point weapons enhancement under circumstances such as these. [Accordingly,] Judge Cleland did not clearly err in concluding that the two-point enhancement for weapons possession was applicable to Benaske.
 
 
 71
 Appellee's Brief at 10-12 (citations omitted).
 
 
 72
 The United States Sentencing Guidelines provide that a defendant's offense level should be increased by two levels if "a dangerous weapon (including a firearm) was possessed" during the commission of a drug trafficking offense, U.S.S.G. Sec. 2D1.1(b)(1), "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. Sec. 2D1.1, comment. (n. 3). Prior to sentencing Benaske, the district court held:
 
 
 73
 Frankly, I get the impression from Mr. Benaske's testimony that he ... does not know a .12 gauge from a .20 gauge and has some confusion in his mind between those and a .22 caliber rifle.... I just don't know what other conclusion I can reach from his testimony but that the man is no hunter....
 
 
 74
 I think that there was a shotgun unloaded, yes, indeed unloaded, but I think there was a shotgun sitting in the corner of that bedroom exposed to anyone who might have walked in. I think it was readily at hand.
 
 
 75
 I don't think that about the guns that were in the closet, especially not the one that was cased. But I'm satisfied that at least one of them, it doesn't matter which one it was, either the shotguns or the rifle, it was out, it was exposed, it was readily at hand and there was drug paraphernalia, proceeds and other things sitting in and around that bedroom as well as other areas of the house.
 
 
 76
 In spite of the fact he might have gone hunting sometime in the past and might have intended to go hunting later on that month or the next, I am unable to find by a preponderance of the evidence that the firearm--the firearms connection with the drug offense is clearly improbable.
 
 
 77
 [T]he evidence does not permit the Court to find a standard of clearly improbable. I think it is just as probable as it might be improbable that the presence of this gun played a part in the drug trafficking in either setting the stage, providing some degree of security internally or otherwise to the defendant, protecting the household which was, from all descriptions I have seen, a drug household.... I conclude the adjustment for the firearm is appropriate in this case, and I will so finalize my findings.
 
 
 78
 Transcript of Benaske's Sentencing Hearing at 93-96. We may not overturn the district court's enhancement determination absent clear error. United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990).
 
 
 79
 Enhancement is appropriate when a defendant constructively possesses a firearm. Constructive possession includes " 'ownership, dominion, or control' over the firearm or 'dominion over the premises' where the firearm was located." United States v. Blankenship, 954 F.2d 1224, 1227 (6th Cir.), cert. denied, 113 S.Ct. 288 (1992) (citation omitted). This court has consistently held that knowledge of a weapon and its availability to the defendant justify the section 2D1.1(b)(1) enhancement. See, e.g., United States v. Snyder, 913 F.2d 300 (6th Cir.1990) (presence of firearms in bedroom nightstand sufficient for section 2D1.1(b)(1) enhancement), cert. denied, 498 U.S. 1039 (1991); United States v. McGhee, 882 F.2d 1095 (6th Cir.1989) (section 2D1.1(b)(1) enhancement triggered by weapons hidden in defendant's house).
 
 
 80
 Because the firearms were found in Benaske's bedroom adjacent to drug trafficking paraphernalia and a quantity of marijuana, we reject Benaske's assignment of error.
 
 III.
 
 81
 We AFFIRM the appellants' sentences for the aforementioned reasons.