16 F.3d 1221
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Barry D. CASHIN, Defendant-Appellant.
 No. 92-2555.
 United States Court of Appeals, Sixth Circuit.
 Feb. 15, 1994.
 
 Before: GUY and SILER, Circuit Judges; and ENGEL, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Barry Cashin, appeals his sentence for conspiracy to distribute marijuana as imposed by the district court following a resentencing hearing. Cashin's original sentence was reversed because the government's use of certain evidence at the sentencing hearing violated his rights under the Confrontation Clause of the Sixth Amendment. Cashin raises the following allegations of error: (1) the district court erred in its determination of drug quantity under the federal sentencing guidelines; (2) the district court improperly adjusted his offense level upward for his role in the offense, for possession of a weapon, and for obstruction of justice; and (3) the district court failed to give him a downward adjustment in offense level for acceptance of responsibility. Should Cashin prevail on any of these issues, he asks that the case be remanded for resentencing before a different district judge. We affirm.
 
 I.
 
 2
 On May 2, 1990, a grand jury sitting in the Eastern District of Michigan returned a six-count indictment against Cashin and two of his co-conspirators. Cashin was charged with conspiracy to distribute marijuana, possession with intent to distribute marijuana, simple possession of LSD, and use of a firearm in relation to a drug crime.
 
 
 3
 On December 10, 1990, Cashin pled guilty to one count of a superseding indictment, which alleged that he participated in a marijuana conspiracy from "sometime in 1986" through April 6, 1990. (App. 14.) His plea came after negotiations during which the government agreed to dismiss several other charges. Cashin and the government could not agree, however, on the various factors that would affect his sentence, the most significant of which was the amount of marijuana distributed by the conspiracy.
 
 
 4
 The district court agreed with counsel that further proceedings would be needed to resolve the disputed sentencing factors. A hearing date was set for February 25, 1991, and the district court ordered the preparation of a presentence report.
 
 
 5
 The report, which was sent to Cashin's counsel on January 15, 1991, stated that approximately seven kilograms of marijuana were seized by federal agents from Cashin's house. The agents also found over $301,000 in currency stashed in the residence, including $294,000 in stacked and bundled notes in a basement safe. The report determined that Cashin had spent over $101,000 above "normal living expenses" during the period of the conspiracy, despite having little in the way of a legitimate income source. Based on the large amount of cash uncovered at Cashin's home, as well as the excess expenditures attributed to him over the period of the conspiracy, the report concluded that the amount of marijuana actually seized did not accurately reflect the scale of the offense. See Application Note 2 to United States Sentencing Guidelines Sec. 2D1.4.
 
 
 6
 After adding the cash on hand to the excess expenditures, the report estimated that Cashin had received over $400,000 in marijuana profits. It found that Cashin sold his marijuana in 25-pound lots. As federal law enforcement agencies calculated that the profit on sales of 25-pound lots of marijuana was approximately $100 per pound, the report divided the $400,000 figure by the $100 per pound profit margin to yield a final estimate of 1,820 kilograms of marijuana distributed. Under U.S.S.G. Sec. 2D1.1(c), 1,820 kilograms of marijuana translated to a base offense level of 32 (1,000 to 3,000 kilograms).
 
 
 7
 Both parties submitted objections to the presentence report. The government's sole objection was the report's failure to assess 4 points to Cashin for his leadership role in the offense. See U.S.S.G. Sec. 3B1.1(a). Cashin took issue with numerous items in the report, especially the method used to calculate the quantity of marijuana. The probation department, however, did not change its report.
 
 
 8
 The parties then filed sentencing memoranda with the district court. In its memorandum, the government essentially adopted the probation department's computations, but argued that Cashin's excess expenditures were $240,000, not $101,000. Using this figure, the government estimated that the conspiracy involved 2,456 kilograms of marijuana. This quantity still translated to a base offense level of 32.
 
 
 9
 In his sentencing memorandum, Cashin attacked the use of the profit margin rather than the price of the drug in determining drug quantity. He also averred that the $294,000 found in his safe was in the safe prior to 1986 and was not acquired as part of the conspiracy. Additionally, Cashin claimed that his profit margin was significantly higher than $100 per pound. He also denied selling his marijuana in 25-pound lots, contending that he had sold, at most, 55 kilograms of the drug. Finally, he disputed the government's calculation of his expenditures above "normal living expenses."
 
 
 10
 At Cashin's sentencing hearing, the government proffered that drug enforcement agents estimated the profit margin on the sale of pound quantities of marijuana in mid-Michigan during the time frame of the conspiracy to be $100 per pound. FBI Agent David Welker then testified that, of the 14.67 pounds of marijuana seized at Cashin's residence, eight pounds were packaged in quantities of one pound each and another bag contained three pounds. The remaining marijuana was found in quantities ranging from one ounce to one-quarter ounce. The government contended that these amounts, in conjunction with other evidence included as exhibits to its sentencing memorandum, supported its theory that Cashin distributed the majority of his marijuana in quantities of at least a pound.
 
 
 11
 Cashin then presented Dr. James Woodford, who was qualified as an expert in the testing and dating of both marijuana and currency. Dr. Woodford testified that the bulk of the marijuana found at Cashin's home was "old" marijuana which contained seeds, and was therefore of undesirable quality. He also stated that he might have been able to render an opinion on the length of time the money found in Cashin's basement safe had been kept there had it not been converted into a cashier's check.
 
 
 12
 The government offered rebuttal testimony from DEA Agent William Dodson, who testified that the profit on quick turnover sales of one pound or larger lots of marijuana was approximately $100 per pound. He indicated, however, that a seller could get "a little bit more than that" if he or she were willing to hold out for a higher price. On cross-examination, Dodson identified a drug transaction record from a notebook seized from Cashin, and the court admitted the record into evidence. It revealed that Cashin sold quantities of less than a pound to some buyers.
 
 
 13
 No other witnesses testified at the hearing, although the parties submitted numerous exhibits related to the disputed calculations. In closing, government counsel argued that Dr. Woodford's testimony provided further support for the government's profit estimate, as seed-laden, relatively undesirable marijuana would be likely to bring a lower profit margin.
 
 
 14
 After the hearing, the government submitted a supplemental sentencing memorandum with additional exhibits. Additionally, the probation department sent a letter to the district court indicating that an interview with a recently-convicted marijuana distributor in the mid-Michigan area revealed that his profit margin was generally $100 to $200 per pound. Cashin objected to the use of the letter.
 
 
 15
 On March 1, 1991, the district court issued a letter to the parties setting forth its tentative findings of fact. The court ratified the government's figure of $240,000 in excess expenditures. Adding that amount to the money found in Cashin's residence, the court concluded that Cashin had made over $540,000 in marijuana profits. It then found that most of Cashin's sales had been in lots of one pound or more. Expressly accepting the $100 per pound profit margin advanced by the government, the court arrived at a total of 5,400 pounds, an amount within the 1,000 to 3,000 kilogram range of base offense level 32.
 
 
 16
 With adjustments for use of a firearm, role in the offense, and obstruction of justice, Cashin's offense level was set at 40. Combined with his criminal history category of III, his guideline range was 30 years to life imprisonment. On March 5, 1991, the district court sentenced Cashin to 31 years' incarceration.
 
 
 17
 Cashin appealed his sentence to this court, arguing that his sentencing hearing was unconstitutional. Specifically, he argued that the government's use of exhibits and proffered proof at the hearing violated his rights under the Confrontation Clause of the Sixth Amendment.
 
 
 18
 Shortly after Cashin filed his appeal brief, this court decided United States v. Silverman, 945 F.2d 1337 (6th Cir.1991). In Silverman, we held that the government must produce evidence comporting with the requirements of the Confrontation Clause to enhance a defendant's sentence if a material fact supporting the enhancement is disputed.
 
 
 19
 Applying Silverman to the facts surrounding Cashin's sentencing, the government conceded that it used evidence not meeting the requirements of the Confrontation Clause. Such evidence was plainly used to prove disputed facts in order to enhance Cashin's sentence. Accordingly, we reversed his sentence and remanded for resentencing.
 
 
 20
 We noted, however, that a request for reargument en banc had been filed in Silverman. In the event that the full court decided to hear the case, the panel decision would be vacated. As it turned out, Silverman was heard en banc and its holding pertaining to the Confrontation Clause was reversed. 976 F.2d 1502 (6th Cir.1992). After consulting with the government and Cashin's counsel, the district court reimposed Cashin's original sentence of 31 years' imprisonment. The instant appeal followed.
 
 II.
 
 21
 Since we reversed and remanded Cashin's sentence on the Confrontation Clause issue, we felt it unnecessary to decide whether the district court properly determined the quantity of marijuana involved in the conspiracy. As Cashin preserved this issue for appeal, however, we must resolve it at present.
 
 
 22
 A district court's decision regarding the amount of illicit drugs "a defendant is to be held accountable for is a finding of fact which must be accepted by a court of appeals unless clearly erroneous." United States v. Walton, 908 F.2d 1289, 1300-01 (6th Cir.), cert. denied, 498 U.S. 990 (1990). The government need only prove those facts upon which the court should rely in sentencing by a preponderance of the evidence. United States v. Carroll, 893 F.2d 1502, 1506 (6th Cir.1990). Moreover, due process merely requires that such factual matters "have some minimal indicium of reliability beyond mere allegation." United States v. Smith, 887 F.2d 104, 108 (6th Cir.1989) (quoting United States v. Baylin, 696 F.2d 1030, 1040 (3d Cir.1982)). "In challenges to the evidence considered by the sentencing judge, the defendant must establish that the challenged evidence is materially false or unreliable, and that such false or unreliable information actually served as the basis for the sentence." United States v. Robinson, 898 F.2d 1111, 1116 (6th Cir.1990) (citation omitted).
 
 
 23
 Here, the government presented a substantial amount of evidence that the approximately $300,000 in cash that was seized from Cashin's residence was money derived from the marijuana conspiracy. This evidence included the following: (1) confirmation that Cashin was incarcerated for tax evasion and participation in a marijuana conspiracy from October 1985 to January 1986; (2) Cashin's W-2 income from 1986 to 1988, which totalled $1,484.70;[1] (3) while Cashin's non-W-2 income from those periods ranged from $11,958 to $23,016, no business records or other indicia of business activity on his part were uncovered by the government; (4) testimony from Cashin's mother that he did not have any legitimate employment for most of his adult life; (5) statements from Sue Ward, Cashin's live-in girlfriend, that he did not work at any legitimate business throughout the course of their relationship; (6) statements by Cashin's co-conspirators and others that Cashin was actively dealing in large quantities of marijuana from 1987 to 1990; and (7) drug records taken from Cashin's home. In light of this evidence, the district court's conclusion that the money found at Cashin's residence was generated by the marijuana conspiracy was not clearly erroneous.[2]
 
 
 24
 Similarly, we are persuaded that the district court's finding that Cashin had $240,000 in excess expenditures was sound. The government asserted that Cashin, having been previously convicted of tax evasion, reported false income information to avoid further problems with the Internal Revenue Service. As a result, it argued that Cashin had essentially no legitimate income during the period of the marijuana conspiracy. This inference was consistent with the grand jury testimony of Douglas Ward that Cashin told him he filed tax returns claiming income in the $30,000 range so as not to arouse suspicion. Further, in its search of Cashin's residence, the government uncovered nothing to suggest that he had engaged in legitimate business transactions. Cashin offered virtually no evidence to rebut the government's contention.
 
 
 25
 Those records available to the government indicated that Cashin made a number of expenditures, including mortgage payments, automobile payments, insurance, utilities, taxes, credit card bills, rental payments for a storage locker, improvements on a farm supposedly owned by Cashin's parents, payments on an undocumented lease/purchase agreement for approximately 210 acres of land, and a lump sum payment in cash on the "lease" of a vehicle. The government's expense calculations were conservative; they did not include payments for food, gasoline, clothing, or other personal expenses. Nor did they include expenses related to a variety of luxury items for which there was no purchase documentation. We are convinced that the district court properly could have relied upon the government's evidence to attribute $240,000 in excess expenditures to Cashin.
 
 
 26
 Cashin is most strenuous in challenging the district court's calculation of the quantity of marijuana to be charged to the conspiracy. He contends that the court's determination that he generally sold marijuana in units of a pound or more, and that those sales yielded $100 per pound in profit, was flawed.
 
 
 27
 Application Note 2 to U.S.S.G. Sec. 2D1.4 (Attempts and Conspiracies) provided:[3]
 
 
 28
 Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.
 
 
 29
 Here, the large amount of cash found at Cashin's residence, as well as his other assets and his expenditures, confirmed his active drug dealing throughout the course of the conspiracy. They indicated that the amount of drugs involved in the conspiracy was far greater than the 14.67 pounds of marijuana actually seized from Cashin's home.
 
 
 30
 As a result, the district court sought to approximate the quantity of the drugs distributed by the conspiracy. From Cashin's drug records, the manner in which the marijuana was packaged, and the absence of traffic in and out of his house (where the marijuana was stored), the court concluded that the bulk of Cashin's drug transactions were in units of a pound or more. As the court noted in its tentative findings:
 
 
 31
 [T]o produce $540,000 in profit (at $1,000 per pound when marketed in small quantities), 8,640 ounces would be implicated over the 52 months (maximum) of the conspiracy. The most common transactions on Exhibit C [a drug record proffered by Cashin at the sentencing hearing] were one-quarter ounce amounts; at that scale, almost 35,000 transactions would be needed ... more than 600 per day, seven days a week for 52 months.
 
 
 32
 This construction strains more than a little both credulity and the other facts.
 
 
 33
 In multiple-pound sales, at a lower profit margin of $100 per pound, a $540,000 profit could be produced from 5,400 pounds. At 25 pounds per transaction, consistent with co-conspirator's statements, only four deals per month would produce the profit. Smaller poundage deals would require more sales activity, but even in mere one-pound lots it would not begin to approach the ridiculously high activity levels needed to support an ounce or quarter ounce sales pattern.
 
 
 34
 The Court could conclude from evidence that far more than half of the $540,000 profit was produced through larger-scale (and lower profit) sales. But even one-half, $270,000, would result in an amount of 2,700 pounds or 1,227 kilograms. The other half at a much higher profit, perhaps $1,000 per pound, would implicate an additional 270 pounds, or 122 kilograms. The Court however is not inclined to accept even this "half-way" construction since it would require more than 17,000 quarter-ounce, or 4,000 one-ounce transactions to market the 122 kilograms. There is no record of information to support this result.
 
 
 35
 (App. 418-19; footnote omitted.)
 
 
 36
 We find nothing in the record to suggest that the district court's conclusion that Cashin was primarily a pound dealer was clearly erroneous. Of the 14.67 pounds of marijuana uncovered at Cashin's residence, 11 pounds of it was packaged in pound or greater quantities and was stored in the basement near the bar. Douglas Ward testified before the grand jury that Cashin consummated his drug transactions at that location. Furthermore, Ward, as well as Robert Vodicka and Terrence Marshall, stated that Cashin dealt in marijuana amounts ranging from 10 to 20 pounds to hundreds of pounds. Their testimony was supported by Cashin's drug records, particularly Exhibits T, U, V and W, which revealed that the vast majority of Cashin's sales were in quantities of a pound or more. Additionally, we agree with the district court that, given the number of transactions required, it was highly improbable that Cashin could have generated the profits he did largely from sales in units of less than a pound.
 
 
 37
 Perhaps the most hotly contested matter raised by Cashin is the profit margin from his marijuana sales. In its sentencing memorandum, the government stated that:
 
 
 38
 Absent any reliable information specific to or from Cashin regarding what he paid for marihuana and what his profits were from selling it, the government must rely on reasonable estimates based on experience in the same geographic area during the relevant time period. It appears that during the relevant time period in the tri-county area that the profit to be made in selling marihuana by the pound was approximately $100 per pound. When marihuana was sold in 25 pound lots, the seller generally realized a profit of $250. Profits per unit of weight increase as amounts decrease.
 
 
 39
 (App. 48.) At Cashin's sentencing hearing, DEA Agent William Dodson lent support to the government's claim of an average $100 per pound profit in the mid-Michigan area from 1986 to 1990. Dodson asserted that "[i]f [a marijuana dealer] wanted to get a quick turnover, he's going to take a lesser profit. It would be approximately a hundred dollars." (App. 648.) He did concede, however, that "[i]f [the dealer] wanted to hold onto it for a bigger dollar, it could even be a little bit more than that. It depends on how quick the person wants to sell their product." (Id.)
 
 
 40
 In addition, the probation department submitted a letter to the district court stating that a recently-convicted marijuana dealer in the mid-Michigan area had stated that his profit on one pound lots of marijuana, which he sold for $1100, was $100 to $200. The testimony of Cashin's own expert witness, Dr. Woodford, would suggest that Cashin's own profit was closer to the $100 figure. Woodford confirmed that the marijuana found at Cashin's residence was full of seeds and was generally of inferior quality. Accordingly, a preponderance of the evidence supported the district court's attribution of a $100 profit margin to Cashin's sales. See Walton, 908 F.2d at 1302. As the court pointed out, even if half of his sales were of quantities of less than a pound, he still would be deemed to have distributed over a 1000 kilograms of marijuana, the cut-off for a base offense level of 32.
 
 
 41
 Similarly, even if Cashin made an average of $245 in profit on every pound of marijuana, he nonetheless would have sold over 1000 kilograms of the drug. Thus, after accounting for the fact that Cashin clearly sold some marijuana in units of less than a pound, and after factoring in variable market conditions (such as occasionally "holding out" for a higher price, and the fluctuations in profit alluded to in the letter from the probation department), we are convinced that the district court's assignment of a base offense level of 32 to Cashin was not clearly erroneous.[4]
 
 III.
 
 42
 Cashin also contends that the district court erred in adjusting his offense level upward for his role in the marijuana conspiracy, for his possession of a weapon, and for obstruction of justice. In addition, he argues that he should have been afforded a downward adjustment for acceptance of responsibility.
 
 
 43
 Cashin notes that, in its presentence report, the probation department did not recommend that he be given an upward adjustment in offense level for his role in the drug conspiracy. (App. 759.) The government objected, asserting that Cashin should be assessed four points pursuant to U.S.S.G. Sec. 3B1.1(a) (Aggravating Role). The probation department, however, did not change its report.
 
 
 44
 The district court ultimately disagreed with the report's conclusion and decided to add four points to Cashin's offense level. As part of its tentative findings following Cashin's sentencing hearing, the court determined that:
 
 
 45
 Defendant was a leader in this drug activity from 1986 to 1990. It was both extensive (by drug amounts and duration) and involved "five or more participants" (the defendant, Robert Reis, Sue Ward, Douglas Ward, Joseph Beagle, Terrence Marshall, Robert Vodicka and others). Four levels are added to the offense score.
 
 
 46
 (App. 419.) The court adhered to its initial determination at sentencing:
 
 
 47
 Finally as to the role in the offense, I think it is amply clear that defendant was engaged in a conspiracy. He pleaded guilty to that. We don't have to dispute he was engaged in a conspiracy. I think it also evident from the record that the conspiracy involved more than five individuals.
 
 
 48
 More important than that, I am satisfied from the evidence by a preponderance of the evidence that the defendant was a person who used others to further his drug transaction schemes. He used people to transport marijuana, he used people to help him harvest marijuana. He used people to house and to distribute marijuana and used others who themselves no doubt were quite willing at the time. Nonetheless, he used them to redistribute many of these larger quantities of marijuana.
 
 
 49
 The guideline 3(B)1.1 calls upon the Court to increase by four levels the seriousness of the offense if the defendant was, quote, an organizer or leader, close quote. The guidelines talk about the defendant being a leader, not the leader, not the maximum leader or the general in this particular business.
 
 
 50
 I think there's some evidence on which the Court could conclude this individual was in fact of that character. But I don't need to reach that conclusion. The only conclusion I need to reach pursuant to that section of the guidelines is that the defendant was a leader and I underline for the record the word a. He was.
 
 
 51
 I'm satisfied of that by a preponderance of the evidence. People answered to him, people were hired by him, people produced, labored and he reaped in many ways the fruits of their labor by virtue of profit from drug amounts.
 
 
 52
 I'm satisfied he was a leader in this affair. It's amply obvious that it involved far more than five people. I could count six or seven at a minimum who from time to time in various capacities were answerable to him, to Mr. Cashin. And I solidify that finding as well.
 
 
 53
 (App. 725-26.)
 
 
 54
 A district court's factual decisions, such as the defendant's role in the offense, are reviewed according to the clearly erroneous standard. Section 3B1.1(a) of the sentencing guidelines provides:
 
 
 55
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 56
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 57
 Cashin claims that the evidence presented at trial indicated that several of those individuals whom he supposedly "led" were, in fact, mere customers of his. After reviewing the record, however, we are satisfied that the government showed that Cashin directed the activities of at least five persons in the marijuana conspiracy. Terrence Marshall, Robert Vodicka, and Joseph Beagle made a number of trips for Cashin to purchase drugs. He also exercised some measure of control over Douglas Ward and Robert Croton. Accordingly, Cashin's contention must be rejected.
 
 
 58
 Cashin next challenges the district court's decision to increase his offense level by two points for possession of a weapon during the commission of a drug offense. The pertinent guideline provision states as follows: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." U.S.S.G. Sec. 2D1.1(b)(1) (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy).
 
 
 59
 The weapon in controversy was a .357 caliber handgun, which was found behind the bar in Cashin's basement, along with ammunition, approximately 10 pounds of pre-packaged quantities of marijuana, packaging materials, and a set of scales.
 
 
 60
 In the wake of the sentencing hearing, the district court tentatively found that:
 
 
 61
 The firearm found in the basement will be counted against the defendant unless the defendant proves by evidence that the firearm's connection to the offense was "clearly improbable." Defendant showed that the .357 magnum here was a hunting weapon (and therefore less likely to be "connected") but evidence showed also that the .357 was in a case with both boxed and loose rounds of ammunition, and that there was nothing, such as a trigger lock, that might prevent the defendant's ready access to the weapon's lethal potential. These factors balance each other in this Court's opinion. The defendant fails to convince that the weapon's connection to the offense was "clearly improbable."
 
 
 62
 (App. 419.)
 
 At sentencing, the court noted:
 
 63
 Although it is true that the defendant produced proof which convinces the Court that this is a hunting weapon, I agree with that, I understand that. It has a scope fitted to it, it had a barrel, on this .357 magnum firearm, handgun firearm supplemented or unsupplemented by the affidavit that was presented by the defense. It seems to me obvious that it was a firearm designed essentially for hunting. That I'm clear of.
 
 
 64
 However, it was also found with ammunition boxed in loose, nothing stood in the way of a quick loading of that weapon from behind the bar where it was kept along with a large number of firearms as proffered and unrebutted by the government. And my finding is that there is nothing that justifies to show that it was clearly and probably, and the word is improbable in the words of the sentencing guidelines, I think that credit must be awarded.
 
 
 65
 (App. 707-08.)
 
 
 66
 Application Note 3 to U.S.S.G. Sec. 2D1.1(b)(1) states: "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." The burden of proof was on Cashin to show that the weapon was not connected to the offense. United States v. McGhee, 882 F.2d 1095, 1097-99 (6th Cir.1989). Here, the weapon in question was found in close proximity to Cashin's marijuana stash. Several drug transactions were carried out at Cashin's basement bar. Even though the weapon was designed for hunting, the district court concluded that it could just as well have been used to protect the drugs. We agree with the court's conclusion in this regard. That a firearm may have been used for legitimate purposes does not mean that it could not also have been deployed in connection with a criminal offense. In view of the proffered evidence, we cannot say that the district court's finding as to Cashin's handgun was clearly erroneous.
 
 
 67
 Cashin also takes issue with the district court's decision to increase his offense level by two points pursuant to U.S.S.G. Sec. 3C1.1 (Obstructing or Impeding the Administration of Justice). However, Cashin was convicted on separate charges of attempted witness tampering, and his conviction was affirmed by this court. See United States v. Cashin, Nos. 91-2303 and 91-2329 (6th Cir. April 9, 1993). He thus was well-deserving of an upward adjustment in offense level for obstruction of justice.
 
 
 68
 Given such conduct on Cashin's part, the district court found that he was not, as he asserts, entitled to a two-point downward adjustment in offense level for acceptance of responsibility. See U.S.S.G. Sec. 3E1.1 (Acceptance of Responsibility). Application Note 4 to U.S.S.G. Sec. 3E1.1 states: "Conduct resulting in an enhancement under Sec. 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both Secs. 3C1.1 and 3E1.1 may apply." Cashin has not shown the existence of any extraordinary circumstances in the case at bar. Consequently, the district court's refusal to decrease his offense level for acceptance of responsibility was not clearly erroneous.
 
 
 69
 AFFIRMED.
 
 
 
 [1]
 The government did not have copies of Cashin's 1989 and 1990 tax returns
 
 
 [2]
 Cashin contended that the money was "earned" through marijuana sales occurring prior to 1986. However, as the district court found, "[n]o evidence was presented by defendant to support the theory that it was from pre-1986 sales, while there is much evidence through statements of co-conspirators that defendant was quite active between 1986 and 1990." (App. 418.)
 3 U.S.S.G. Sec. 2D1.4 (Attempts and Conspiracies), under which Cashin was originally sentenced, was deleted by consolidation with the guidelines applicable to the underlying substantive offenses, effective November 1, 1992. Application Note 2 to Sec. 2D1.4 was made part of the current Application Note 12 to Sec. 2D1.1.
 
 
 [4]
 At oral argument, defendant also relied on our recent decision in United States v. Samour, 9 F.3d 531 (6th Cir.1993). In Samour, we remanded to the district court because there was insufficient evidence to support the judge's conversion of money proceeds to drug quantity. Here, we reach a different result because of a different record. We feel the record here supports a base offense level of 32