**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 03-1770

UNITED STATES OF AMERICA,

Appellee,

v.

ANDREW GHALASHAHI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

(Hon. Steven J. McAuliffe, U.S. District Judge)

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Shelly Kindred for appellant.
Donald A. Feith, Assistant United States Attorney, with whom
Thomas P. Colantuono, United States Attorney, was on brief for
appellee.

March 16, 2004

**Per Curiam**. Defendant-appellee Andrew Ghalashahi was convicted of conspiracy to commit extortion, in violation of 18 U.S.C. §§ 371 and 875(d); extortion, in violation of 18 U.S.C. § 875(d); and receiving proceeds of extortion, in violation of 18 U.S.C. § 880. He appeals from that conviction, contending that the district court erred when it reserved its ruling on his motion for judgment of acquittal under Fed. R. Crim. P. 29 after the government's case-in-chief, and thereafter denied both his original and renewed motions for judgment of acquittal after the close of all evidence. We find his arguments unavailing and affirm.

## I. BACKGROUND

In the early morning hours of June 29, 2002, Kurt Engelhardt and Melissa Harbour met at a house party hosted by Harbour's friend, Ava Weldon, in Manchester, New Hampshire. Harbour was highly intoxicated throughout the night--Engelhardt observed her falling down three or four times, twice falling to the ground. According to Engelhardt's testimony at trial, they left the party at approximately 6:30 a.m. After conversing over coffee at a local restaurant, Harbour invited Engelhardt back to her home. Upon arrival, she gave him a tour of the home and spoke about her two year-old son. Again according to Engelhardt's trial testimony, the two proceeded upstairs and thereafter engaged in sexual intercourse with a condom provided by Harbour. Within a short

time, Engelhardt left the Harbour residence. He neither asked for Harbour's telephone number nor gave his number to Harbour.

Kathryn Burton, a friend of Harbour's who had also attended the house party, left the Weldon home at approximately 7 a.m. She went to Harbour's apartment, went into the second bedroom across the hall from Harbour's bedroom, and fell asleep. At trial, she testified that Harbour entered the room later in the morning and was laughing. Burton eventually left Harbour's home at approximately 11 a.m. that same day. Before departing, she entered Harbour's bedroom and observing her sleeping, unsuccessfully tried to wake her.

Later that afternoon, Harbour and Weldon got together again and went shopping at a local mall. They then went country line dancing at a bar in Methuen, Massachusetts. They returned to Manchester later in the evening, where they visited a couple of bars through the night, and then had breakfast together in the early hours of the morning.

Weldon testified that, a few days later at Harbour's request, she obtained Engelhardt's phone number from John Schiavone, a friend of Engelhardt's, and gave it to Harbour. Weldon also testified that Ghalashahi and Harbour had been engaged in a romantic relationship at some point.

A few days later on July 2, Engelhardt received a number of voice mail messages in which Ghalashahi, through a computerized

-3-

voice, repeated, "We know what you did.  We're going to the police.  You have to pick up the phone.  You're a jerk."  The following morning, Ghalashahi called again and Engelhardt spoke to him for the first time.  He assumed that the caller was Harbour's boyfriend and apologized to the caller while explaining that Harbour had told him that she did not have a boyfriend.  Ghalashahi told Engelhardt that he and Harbour were just friends and then asked Engelhardt to explain what happened between him and Harbour.  Engelhardt in turn told Ghalashahi that he and Harbour had engaged in sexual intercourse.  Ghalashahi expressed surprise because Harbour had not told him that she and Engelhardt had had sex.

Ghalashahi then told Engelhardt that he had a friend who had gone to prison for sexually touching a girl and that Harbour was going to report him to the police for rape unless Engelhardt paid her $5,000.  Later that same day, Engelhardt received another phone call from Ghalashahi, who this time demanded $50,000 and told Engelhardt to meet him at a store in Manchester, New Hampshire at approximately 5:00 p.m. that day.

At the meeting, Engelhardt and Ghalashahi sat in Engelhardt's car.  Ghalashahi identified himself as "Drew."  He gave Engelhardt a handwritten list of demands, which included a demand for a written apology, a sexually transmitted disease test, and $150,000.  The list gave Engelhardt credit for the $5,000 demanded earlier in the day, even though at that point it had not

been paid, and listed an outstanding balance of $145,000. In conversation, Ghalashahi told Engelhardt that Harbour had demanded $300,000, but that he had talked her down to $150,000. At the end of the meeting, Engelhardt gave Ghalashahi $5,000. Ghalashahi then told Engelhardt that he was going to meet with Harbour, who he said was waiting nearby in Ghalashahi's car.

Between July 3 and July 22, 2002, Ghalashahi called Engelhardt at least once per day to ask about the money demanded, on some occasions calling several times a day. On July 22, Engelhardt contacted the FBI.

While Engelhardt was describing the events of the past three weeks to the FBI, he received a phone call from Ghalashahi. With Engelhardt's consent, the FBI recorded the conversation. At the FBI's direction, Engelhardt set up a meeting with Ghalashahi for July 23, 2002, mentioning to Ghalashahi that he might not have all the money by this time.

Later on July 23, the FBI, again with Engelhardt's consent, recorded another phone conversation with Ghalashahi during which Ghalashahi admonished Engelhardt for mentioning the meeting location on the telephone. Ghalashahi spoke in code, referring to the purpose of the meeting as relating to a car purchase and payment by cashier's check.

On July 24, 2002, Ghalashahi was charged with one count of extortion. He appeared before a Magistrate Judge and was

released on conditions. On August 2, 2002, he was arrested for violating his conditions of release after the United States Probation Office learned that he had attempted to contact Harbour. On August 22, 2002, a federal grand jury indicted him on three charges: (1) Count One, conspiracy to commit extortion, in violation of 18 U.S.C. §§ 371 and 875(d); (2) Count Two, extortion, in violation of 18 U.S.C. § 875(d);[1] and (3) Count Three, receiving proceeds of extortion, in violation of 18 U.S.C. § 880.

At a January 23, 2003 final pretrial conference, the district court noted that Ghalashahi might have a defense under the claim of right doctrine. The government objected to the application of the defense. The court eventually overruled a motion in limine filed by the government seeking to exclude the claim of right defense to the extortion charge and any evidence in support of the defense.

A jury trial commenced on February 4, 2003. In addition to the evidence described above, the government introduced telephone records showing that Ghalashahi had made 131 telephone

---

[1]18 U.S.C. § 875(d) provides:

Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

-6-

calls to Engelhardt's cell phone from July 2, 2002 through July 23, 2002, and forty-one calls to Harbour's telephone numbers during the same period. Also, the government introduced a series of admissions by Ghalashahi to law enforcement in which he (1) explained that every time he had contact with Engelhardt he soon thereafter spoke either in person or via telephone with Harbour, (2) admitted his intent to scare Engelhardt, (3) admitted splitting with Harbour the $5,000 that Engelhardt paid him on July 2, 2002, and (4) admitted that a deposit slip in the amount of six thousand dollars found on his person at the time of the arrest pertained to some of the money he expected to receive from Harbour later that day. On February 6, the government rested its case and Ghalashahi moved for a judgment of acquittal under Fed. R. Crim. P. 29(a). The court reserved ruling on the motion. The trial proceeded and Ghalashahi testified in his own defense. He renewed his motion for judgment of acquittal after the close of all evidence. The court denied his original motion, explicitly stating that it was relying only on the evidence presented by the government in its case-in-chief. It also denied Ghalashahi's renewed motion.

On February 7, 2003, the jury found Ghalashahi guilty on all three counts. On May 14, 2003, he was sentenced to thirty months imprisonment on Count One and twenty-four months imprisonment on Counts Two and Three. This appeal followed.

## II. DISCUSSION

In general, we review <u>de novo</u> a district court's ruling on a motion made pursuant to Fed. R. Crim. P. 29(a). <u>See</u> <u>United States</u> v. <u>Diaz</u>, 300 F.3d 66, 78 (1st Cir. 2002). We view the evidence in the light most favorable to the verdict, draw all reasonable inferences and credibility disputes in the verdict's favor, and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>See</u> <u>United States</u> v. <u>Czubinski</u>, 106 F.3d 1069, 1073 (1st Cir. 1997); <u>United States</u> v. <u>Ortiz</u>, 966 F.2d 707, 711 (1st Cir. 1992) (must uphold any verdict that is "supported by a plausible rendition of the record"). Our review spans the totality of the evidence, both direct and circumstantial, and we "reject those evidentiary interpretations and illations that are unreasonable, unsupportable, or overly speculative." <u>United States</u> v. <u>Spinney</u>, 65 F.3d 231, 234 (1st Cir. 1995).

First, Ghalashahi argues that the district court lacked authority to reserve its ruling on his motion for judgment of acquittal made at the end of the government's case-in-chief. The plain language of Rule 29 provides otherwise:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offenses.

Fed. R. Crim P. 29(a). The rule continues:

> The court may reserve decision on the [Rule 29] motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

Fed. R. Crim. P. 29(b). The Advisory Notes to the 1994 amendment of the rule state that the court is allowed to reserve judgment on a Rule 29 motion made at the close of the government's case-in-chief:

> The amendment permits the reservation of a motion for a judgment of acquittal made at the close of the government's case in the same manner as the rule now permits for motions made at the close of all of the evidence . . . . While the amendment will not affect a large number of cases, it should remove the dilemma in those close cases in which the court would feel pressured into making an immediate, and possibly erroneous, decision or violating the rule as presently written by reserving its ruling on the motion.

Fed. R. Crim. P. 29 advisory committee's note. The Advisory Committee recognized the problem in a scenario "where the defense decides to present evidence and run the risk that such evidence will support the government's case." Id. The rule takes care of that problem by providing that the district court "consider only the evidence submitted at the time of the motion in making its

-9-

ruling, whenever made" and "in reviewing a trial's court ruling, the appellate court would be similarly limited."  Id.

Here, the district court followed Rule 29's requirements. It reserved its ruling on Ghalashahi's motion at the close of the government's case-in-chief upon concluding that the government's evidence could sustain a conviction.  At the close of all evidence, the court denied Ghalashahi's Rule 29 motion (original and renewed) based on the same quantum of evidence presented by the government during its case-in-chief:

> I reserved ruling on the motion for judgment of acquittal under Rule 29 at the close of the government's case, and considering the evidence presented by the prosecution in their case in chief, not considering the evidence presented by the defense, focusing solely on the evidence presented by the government, [the government] persuaded me that the indicia of fraud, if you will, could be found by the jury to be evidence of lack of sincerity or honest belief and the legitimacy of the claim of right.  And therefore, given Mr. Engelhardt's testimony that a sexual assault or no assault of any type occurred at all, plus the evidence of the actions and demeanor and manner of behavior of the defendant in carrying out the so-called negotiations, the jury could find a reasonable doubt every element of the offense charged, the offense as charged.  So the motion is denied.

The court concluded that the jury could find beyond a reasonable doubt every element of the charged offenses based on the government's evidence alone.  We review a district court's reservation of a Rule 29 ruling for an abuse of discretion.  See United States v. Davis, 1996 U.S. App. LEXIS 1388, at *7 (6th Cir.

-10-

Jan. 16, 1996) (citing <u>United States</u> v. <u>Walton</u>, 908 F.2d 1289, 1294 (6th Cir. 1990)).  We see none here.

Second, on a more substantive ground, Ghalashahi contends that the government failed to submit evidence sufficient to sustain a conviction on any of the charges and that the district court committed reversible error by reserving and then denying his Rule 29 motion for judgment of acquittal.  Specifically, he contends that the government failed to disprove his claim of right defense.[2]

---

[2]Ghalashahi had no quibble with how the claim of right defense was presented to the jury.  The district court's instruction to the jury read:

The defendant cannot be guilty of extortion, or conspiracy to commit extortion, or receipt of the proceeds of extortion if:
First, he, or the person on whose behalf he was acting, has a valid claim that he, or the person on whose behalf he was acting, had a valid claim to the money demanded.
Second, the facts he allegedly threatened to disclose in an effort to collect that money were solely related to that valid claim.
And third, he reasonably and honestly believed those facts to be true.
Under such circumstances, the defendant could not be said to have acted in a "wrongful" manner.  Instead, he is said to have been pursuing a "claim of right."
. . . In this case, the defendant's alleged use of a threat was not "wrongful" and the government has failed to carry its burden of proof if the defendant was acting under a "claim of right."  He was acting under a claim of right if he was acting on behalf of, or as the agent of, Melissa Harbour; he had a sincere and honest belief, even if mistaken, that Ms. Harbour had a valid claim against Mr. Engelhardt for compensation for injuries or other harm she suffered; that is, sexual assault; and the facts the defendant allegedly threatened to reveal to the police about Mr. Engelhardt were solely related to that valid claim for compensation for sexual assault.

-11-

With regard to Ghalashahi's Motion for Acquittal submitted at the close of the government's case-in-chief, the district court commented that the government had presented little evidence on what exactly transpired between Harbour and Engelhardt during the sexual encounter. The court advised the government that it had "to demonstrate that there is some evidence in this case from which the jury can find that [Ghalashahi] threatened to report Engelhardt for a crime, and the crime was not related to a claim of right." The court continued, "Here the crime is assault of some kind. So you have to say the jury could find in this case that this defendant did not have a basis to reasonably believe than an assault of some kind had taken place when he made the threat to report [Engelhardt] for the crime of assault."

Though the district court may have thought that the government's case-in-chief was not the strongest of cases, it also recognized the standard of review for Rule 29 motions and the inappropriateness of a judgment of acquittal, particularly with regard to the claim of right defense:

> I think the weakness you have, Mr. Norkunas [Ghalashahi's trial counsel], right now is Engelhardt says [the alleged rape] didn't happen. If the jury believes it didn't happen, they can infer that Ms. Harbour darn well knew it didn't happen. I agree it's kind of a leap next to infer that Ghalashahi therefore knew it didn't happen, but that coupled with the badges of fraud that [the government] is identifying, I suppose there are sufficient badges of fraud here, indicia of fraud, that coupled with Engelhardt's

testimony, that they probably could find beyond a reasonable doubt that he did not have genuine belief in the legitimacy of the claim he was advancing.

It was along these same lines that the district court later denied Ghalashahi's Rule 29 motion. And indeed, the government submitted sufficient evidence from which a reasonable jury could find Ghalashahi guilty of the crimes with which he was charged. The evidence was also sufficient to rebut his claim of right defense. First, the government presented evidence that the sexual encounter between Engelhardt and Harbour was consensual, and hence lawful. Engelhardt testified that Engelhardt and Harbour engaged in a consensual sexual encounter during which Harbour was conscious and provided him with a condom. Upon being shown photographs of bruises on Harbour's elbow and buttock, Engelhardt denied that anything happened between him and Harbour that would have caused the bruises. From this evidence, the jury could conclude, at minimum, that Harbour knew that she did not have a legitimate claim of right to the money demanded. The notion that Ghalashahi acted as her agent in obtaining the money from Engelhardt--which Ghalashahi has argued strenuously throughout this litigation--provides an inferential link to Ghalashahi's own knowledge that he had no right to the money. Without a sexual assault, there was no possible basis for compensation.

Second, and more importantly for the purpose of disproving Ghalashahi's claim that he sincerely and reasonably

-13-

believed Harbour's claim that she was raped, the district court noted the numerous "indicia of fraud" on the part of Ghalashahi from which a jury could discredit a claim of right defense. It is apparent that he did not even know that Engelhardt and Harbour had engaged in a sexual encounter before Engelhardt had told him. He made more than 130 phone calls to Engelhardt and forty-one calls to Harbour over a twenty-one day period. He first contacted Engelhardt using a disguised computer-generated voice. The government also garnered admissions from Ghalashahi that he and Harbour collaborated to threaten to make a claim of rape unless Engelhardt paid them money, and that he kept raising the monetary amount demanded and continually threatened to increase the amount unless Engelhardt paid in full. In addition, Ghalashahi demanded that the money be paid in cash and used code words to disguise the nature of the transaction. He and Harbour split the initial payment of $5,000; thereafter, he expected to receive at least an additional $6,000. Only when Engelhardt agreed to pay the initial $5,000 did Ghalashahi and Harbour want more and demand more, from $50,000 to $150,000, and then possibly to as much as $300,000.

If Ghalashahi knew he was extorting money as an agent for Harbour--and from his fishy behavior, the jury could conclude exactly that--then he necessarily knew that he had no lawful claim to it. Overall, Ghalashahi's conduct during his "negotiations" with Engelhardt belies his claim of sincerity or reasonableness in

-14-

believing that the money he demanded was rightfully his and Harbour's. None of the government's evidence compels a sole rational conclusion in favor of Ghalashahi. Because the government's evidence permits a jury to find otherwise, he is not entitled to a judgment of acquittal under Rule 29.

During oral argument on appeal (but not in its brief), the government asked us to provide guidance on the applicability of the claim of right defense to an § 875 prosecution such as this, where the alleged extortionate threat is an accusation of criminal conduct. Specifically, the government suggested that threats to accuse a person of a crime are explicitly prohibited by the statute and are inherently wrongful. Whether to permit a claim of right defense in such a situation is an issue of first impression in this court. As the parties neither presented the issue squarely nor meaningfully argued it to us, we need not address it. See Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 36 (1st Cir. 1994). More importantly, resolution of the issue would not change the result in this case. Hence, assuming without deciding that the claim of right defense applies to this case, the district court's reservation and denial of Ghalashahi's Rule 29 motion was proper.

Accordingly, we affirm.